UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MICHAEL A. SNEDGEN,<br><br>        Plaintiff,<br><br>    v.<br><br>HOWMEDICA OSTEONICS<br>CORPORATION d/b/a<br>STRYKER ORTHOPAEDICS,<br><br>        Defendant. | Civil Action No. 19-1707 (ABJ)<br><br>***SEALED*** |

**MEMORANDUM OPINION**

Michael A. Snedgen brought this action against Howmedica Osteonics Corporation d/b/a Stryker Orthopaedics ("Howmedica") on June 12, 2019. Compl. [Dkt. # 1]. The case arose from the failure of a prosthetic knee implant and the subsequent medical complications plaintiff suffered. First Am. Compl. [Dkt. # 22] ¶¶ 11, 15, 17. The failed component of the prosthetic knee, a Modular Rotating Hinge ("MRH") Tibial Bearing Component, XS/XLG, Ref.: 4481-2-103, Lot: 023225D ("Component"), was manufactured by defendant, Howmedica. First Am. Compl. ¶¶ 9–10; *see also* Def.'s Answer to Pl.'s First Am. Compl. [Dkt. # 23] ¶ 10; Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. [Dkt. # 38] ("Pl.'s Opp.") at 1.[1]

The complaint consists of only one count: plaintiff alleges that defendant is strictly liable for manufacturing the Component "with defects that made it unreasonably dangerous." First Am. Compl. ¶ 32.

---

1    Because the case involves plaintiff's medical information, the filings related to this motion, including exhibits, are under seal.

On December 14, 2021, defendant moved for summary judgment. Mot. for Summ. J. by Def. Howmedica [Dkt. # 36]. This motion has been fully briefed. *See* Mem. of Law in Supp. of Def. Howmedica Osteonics Corp.'s Mot. for Summ. J. [Dkt. # 33-6] ("Def.'s Mem."); Pl.'s Opp.; Reply in Supp. of Def. Howmedica Osteonics Corp.'s Mot. for Summ. J. [Dkt. # 39] ("Def.'s Reply").

Both parties relied on experts to substantiate their briefs and statements of fact. Plaintiff submitted a report from a metallurgy expert, Dr. David Pope. *See* Ex. 27 to Def.'s Mem. [Dkt. # 33-33] ("Pope Report"). Dr. Pope has "a Ph.D. in Materials Science from the California Institute of Technology . . . [and] has taught at the University of Pennsylvania since 1968." Pl.'s Opp. at 11 (citations omitted); Pope Report at 1.

Defendant submitted a report from its own metallurgy expert, Dr. Brad James. Ex. 28 to Def.'s Mem. [Dkt. # 33-34] ("James Report"). Dr. James is "a Principal Engineer and Group Vice President of Exponent's Infrastructure and Materials Group. [He] received [his] Ph.D. in Metallurgical and Materials Engineering from the Colorado School of Mines in 1994." *Id.* at 1. Defendant also submitted a report from Dr. Felicia L. Svedlund, who is "presently employed as a Managing Scientist in Exponent's Biomedical Engineering and Sciences practice." Ex. 7 to Def.'s Mem. [Dkt. # 33-13] ("Svedlund Report") at 5. She earned both "a Master of Science in Materials Science and Engineering (focus on Biomaterials) from the University of California, Berkeley" and "a Doctor of Philosophy in Materials Science and Engineering (focus on Biomaterials) from the University of California, Berkeley" in 2016. *Id.* And finally, defendant submitted a report from Dr. Jeffrey S. Kneisl, who is "a board certified orthopedic surgeon specializing in orthopedic oncology, limb-salvage surgery, and pediatric orthopedic surgery." Ex. 3 to Def.'s Mem. [Dkt. #

33-9] ("Kneisl Report") at 1. Kneisl is a professor and "Director of Orthopaedic Oncology" at the Carolinas Medical Center; he earned his medical degrees at Northwestern University. *Id.*

Defendant argues that there is no evidence to suggest that the failure of the Component arises from a specific manufacturing defect. Def.'s Mem. at 12; Def.'s Reply at 3. In its view, the record contains evidence that supports "plausible alternative causes" of the fracture, such as plaintiff's "compromised biomechanics and improper use of the device." *See* Def.'s Mem. at 17–21; Def's Reply at 2-3. Plaintiff contends that "the Component was destined to fail, regardless of the forces applied, because of the surface defects." Pl.'s Opp. at 3. "These defects rendered the Component unreasonably dangerous." *Id.*

Because these competing theories reflect an obvious dispute of fact, based on divergent expert analyses, the motion for summary judgment will be **DENIED**.

## BACKGROUND

### I.   Plaintiff's Medical History

The medical history surrounding plaintiff's right leg and knee is critical to understanding this case. Plaintiff's troubles started in 1998, when he "was diagnosed with osteosarcoma (bone cancer) in his right distal femur." Statement of Uncontroverted Material Facts by Def. Howmedica Osteonics Corp. [Dkt. # 33-5] ("Def.'s SOF") ¶ 20, citing Ex. 13 to Def.'s Mem. [Dkt. # 33-19], Kneisl Report at 6. "Between 1998 and 1999, [p]laintiff had five surgeries on his right knee and underwent multiple rounds of chemotherapy" to treat this illness. Def.'s SOF ¶ 21, citing Ex. 14 to Def.'s Mem. [Dkt. # 33-20], Ex. 15 to Def.'s Mem. [Dkt. # 33-21], and Kneisl Report at 6. And "[i]n December 1998, [p]laintiff underwent surgical removal of a tumor, and limb-salvage surgery, where his right femur and knee were replaced with a Stryker Modular Replacement System

Megaprosthesis." Def.'s SOF ¶ 22, citing Ex. 16 to Def.'s Mem. [Dkt. # 33-22], Kneisl Report at 6.[2]

The limb-salvage surgery initially appeared to be successful. Following the surgery, plaintiff returned to his previous lifestyle as "a very active individual." Def.'s SOF ¶ 23, citing Ex. 17 to Def.'s Mem. [Dkt. # 33-23] at 3. Both his job and his hobbies required regular physical exertion; his "full-time [job] in construction [] required him to be on his feet all day and constantly climbing up and down stairs and ladders," while his "hobbies and exercise [consisted of] hiking, kayaking, and bicycling." Def.'s SOF ¶¶ 24–25, citing Ex. 1 to Def.'s Mem. [Dkt. # 33-7] ("Snedgen Dep.") at 24:5–12, 92:4–8. Plaintiff continued similar levels of activities in the following years. Def.'s SOF ¶ 27, citing Ex. 20 to Def.'s Mem. [Dkt. # 33-26] at 4;[3] Ex. 21 to Def.'s Mem. [Dkt. # 33-27] at 3–4. Defendant notes, though, that given the assessment of the

---

2   Facts are undisputed unless otherwise noted. As part of his opposition, plaintiff filed an Opposition to Material Facts responding to Def.'s SOF [Dkt. # 38] ("Pl.'s Opp. to Def.'s SOF"), as well as submitting additional facts of his own. Pl.'s Additional Facts [Dkt. # 38] ("Pl.'s SOF"). Defendant responded in a footnote in its reply brief, stating that "HOC does not accept or adopt any of Plaintiff's characterizations in the 'Response to Defendant's Numbered Facts' or 'Plaintiff's Additional Facts' sections of 'Plaintiff's Opposition to Material Facts.' Many of those statements constitute legal conclusions, not facts, and are obviously disputed. *See, e.g.*, Pl.'s Opp. to Material Facts ("OMF") ¶¶ 81–84." Def.'s Reply at 3 n.2. But defendant's blanket objection to all of the additional facts proffered by the plaintiff is not appropriate under the Scheduling Order in this case – or the local rules. *See* Scheduling Order [Dkt. # 16] ¶¶ 10, 11 ("The opposition to a motion for summary judgment must also include the statement of genuine issues described in Local Civil Rule 7(h)(1) that lists any additional facts which the respondent contends are material and present a genuine issue for trial. . . . If a respondent provides a statement of additional material facts which are in dispute, then, within the time permitted for a reply, the movant may file a concise and supported response to each of the respondent's facts, also in a numbered format that corresponds to the numbers in the respondent's statement."). As a result, though the Court will not accept legal conclusions masquerading as facts, the additional facts submitted by plaintiff will be accepted as undisputed insofar as they have record support.

3   The Court will use PDF page numbers for [Dkt. # 33-26] and any other documents in which there are no page numbers on the document itself. Otherwise, page numbers refer to the numbers stamped on the documents.

defendant's knee in January of 2000, plaintiff's doctor advised him "that he should avoid any type of high impact activity" and specifically recommended against plaintiff's habit of doing flips on a trampoline or "biking a lot." Def.'s SOF ¶¶ 26–27, citing Exs. 17, 20, 21 to Def.'s Mem. [Dkts. # 33-23, 33-33, 33-34.

Nonetheless, that surgery withstood plaintiff's use of his knee for quite some time. In 2012, fourteen years after the implant, "[p]laintiff went to the hospital after experiencing a series of disabling recurrent falls, hyperextension in his knee, and clicking in his joint." Def.'s SOF ¶ 28 (internal quotation marks omitted), citing Ex. 22 to Def.'s Mem. [Dkt. # 33-28] at 8–39. On February 22, 2012, Dr. Robert Mikael Henshaw "performed a revision surgery on [p]laintiff's megaprosthesis knee implant" and "discovered that [p]laintiff's megaprosthesis had multiple fractured and/or worn-out parts, including a worn-out MRH tibial bearing component." Def.'s SOF ¶ 29, citing Ex. 22 to Def.'s Mem. at 2–3. Dr. Henshaw replaced plaintiff's worn-out parts with the Component. Def.'s SOF ¶ 29. As part of that procedure, a new tibial bearing component – the Component at issue in this lawsuit – was "inserted into the polyethylene component" of the new "distal femoral component," which was "placed and connected with the rest of the prosthesis" during Dr. Henshaw's procedure. Svedlund Report at 7.

After the 2012 revision surgery, plaintiff "returned to work in construction and resumed his physical hobbies, including bicycling, kayaking, gardening, and hiking." Def.'s SOF ¶ 31, citing Snedgen Dep. at 89:12–19, 90:9–22, 92:4–94:1, 94:14–96:20, 113:22–116:13. Defendant does not point to any additional warnings from doctors about plaintiff's activity level after this particular surgery, but defendant has submitted a variety of "Instructions for Use [] accompanying the Component." Def.'s SOF ¶ 13. The Instructions for Use, which are directed to the attention of the Operating Surgeon, see Ex. 12 to Def.'s Mot. [Dkt. # 33-18] ("IFU") at 4, provide:

- "[t]he patient should be cautioned to limit activities, protect the replaced joint from unreasonable stresses and follow the instructions of the physician with respect to follow-up care and treatment."

- "If the patient is involved in an occupation or activity which includes significant impact loads (walking, running, lifting or twisting), the resultant forces can accelerate failure of the fixation, the device, or both."

- "While rare, fatigue fracture of the implant can occur as a result of trauma, strenuous activity, improper alignment or extreme duration of service."

Def.'s SOF ¶¶ 13–17, citing IFU.[4]

Four years later, in November of 2016, plaintiff "was walking in a parking lot when he suddenly experienced pain and a disjointed feeling in his leg." Pl.'s SOF ¶ 49, citing Snedgen Dep. at 97:4–98:20. "Plaintiff returned to MedStar Washington Hospital Center . . . [reporting] pain in his right knee." Def.'s SOF ¶ 32, citing Ex. 24 to Def.'s Mot. [Dkt. # 33-30] at 6. The doctor at the hospital, Dr. Brock Adams, "found that the Component had fractured." Def.'s SOF ¶ 32, citing Ex. 24 to Def.'s Mot. at 7. More specifically, Dr. Adams observed "[a]n oblique fracture through the rotating platform" of the Component. Svedlund Report at 12; *see also* Pl.'s SOF ¶ 50 ("the Component had 'a catastrophic failure.'"), quoting Ex. 4 to Def.'s Mot. [Dkt. # 33-10] ("Adams Dep.") at 79:16–22, ¶ 52 (providing a picture of the fractured Component "after it was removed from Plaintiff"). On November 29, 2016, "Dr. Adams performed a revision surgery to replace the Component." Def.'s SOF ¶ 33, citing Ex. 32 to Def.'s Mot. [Dkt. # 33-38], First Am. Compl. ¶ 13.

---

4   Plaintiff disputes the materiality of these instructions but does not dispute that they accompany the Component.

Between May 2017 and May 2018, "[p]laintiff had additional operations on his right knee as a result of infections in his implant," culminating with the complete replacement of the megaprosthesis that contained the Component at issue on May 30, 2018. Def.'s SOF ¶ 34, citing Ex. 25 to Def.'s Mem. [Dkt. # 33-31] at 7. In May of 2021, plaintiff fell down a ladder and fractured his right femur. Def.'s SOF ¶ 35. On May 17, 2021, Dr. Adams "converted" plaintiff's "existing prosthesis to a total femoral replacement." Def.'s SOF ¶ 35, citing Snedgen Dep. at 130:10–131:3, Ex. 26 to Def.'s Mot. [Dkt. # 33-32] at 1–2.

## II.   The Component's Design, Manufacturing, and Testing

The Component was a part of plaintiff's megaprosthesis, a device used to replace "segments of the tibia and femur bone as well as the knee joint." Def.'s SOF ¶ 3, citing Kneisl Report at 5, ¶ 22. The MRH tibial bearing component "is a metal part that links the femur to the tibia and substitutes for the ligament that normally provide stability to the knee." Def.'s SOF ¶ 5, citing Ex. 6 to Def.'s Mem. [Dkt. # 33-12] ("McGovern Dep.") at 56:19–57:5.

Defendant states that the Component was "made of forged cobalt chrome," a material "ubiquitous in orthopaedic implant design." Def.'s SOF ¶ 6, citing McGovern Dep. at 57:12–14. Plaintiff disputes this, and states that "MRH tibial bearing components, including the Component, are made of a forged cobalt-chrome-molybdenum alloy." Pl.'s Opp. to Def.'s SOF ¶ 6, citing Ex. 11 to Def.'s Mem. [Dkt. # 33-17] ("Stypa Tr.") at 8:16–18.[5]

The manufacturing process began with another company. First, the "Component was forged by . . . Symmetry Medical." Pl.'s SOF ¶ 61, citing Stypa Tr. at 8:8–13:4. "Before sending the forged material to Defendant, Symmetry Medical performed dye-penetrant testing" on the

---

5   Jaro Stypa is defendant's "designated representative and senior manufacturing engineer." Def.'s SOF ¶ 47.

unfinished Component. Pl.'s SOF ¶ 71. The test is meant to ensure the absence of "flaws, cracks, or imperfections on the Component's surface." Def.'s SOF ¶ 10; *see also* Pl.'s SOF ¶ 72 ("The purpose of the dye-penetrant testing is to reveal any imperfections on the surface of the material, such as cracks."). So if the Component passed the dye-penetrant testing, plaintiff asserts, that means "there were no cracks or other defects in the product." Pl.'s SOF ¶ 72, citing Stypa Tr. at 71:5–16.

After the dye penetrant testing, Symmetry Medical delivered the Component to defendant, and defendant "finished the manufacturing process," Pl.'s SOF ¶ 74, citing Stypa Tr. at 107:14–18, by putting the Component through "sandblasting, dry blasting, and laser etching" steps. Pl.'s SOF ¶ 62, citing Ex. 2 to Def.'s Mem. [Dkt. # 33-8] at 3. During the sandblasting step, which aimed to "create[] a matte finish on the surface[,] . . . an operator [held] the part in his hand and [shot] a blasting media into the part." Pl.'s SOF ¶ 63, citing Stypa Tr. at 15:5–17:8. "The media used to sandblast the Component was ninety percent aluminum oxide." Pl.'s SOF ¶ 64, citing Stypa Tr. at 17:9–17. Following the sandblasting, the Component underwent dry blasting, which used a "separate blasting cabin" as well as a different blasting media that "was about 3.1 percent aluminum oxide." Pl.'s SOF ¶¶ 66–67, citing Stypa Tr. at 18:4–10, 19:4–9.

Plaintiff points out that once the Component was finished, defendant did not repeat the dry penetrant testing that Symmetry Medical had previously performed on the unfinished Component. Pl.'s Opp. ¶ 74, citing Stypa Tr. at 107:14–18. Plaintiff also asserts that "[d]efendant did not inspect the surface of the Component to see what was left on the surface." Pl.'s SOF ¶ 75, citing Stypa Tr. at 21:14–16, 61:22–62:4.

### III.   Stress Fracture

The parties agree that the Component "fractured in 2016 due to 'fatigue crack' initiation and growth on the Component's surface at a laser marking." Def.'s SOF ¶ 36, citing Pope Report at 6–7; Pl.'s SOF ¶ 53; *see also* Def.'s SOF ¶ 42, citing James Report at 8 ("The Component fractured due to bending fatigue crack initiated on the Component's superior surface . . . and grew both through the plate thickness and in nominally medial and lateral directions.").

Plaintiff's contention is that three factors observed in the examination of the Component point to the presence of "defects" that are traceable to the manufacturing process: (1) the laser marking, (2) cracks, and (3) embedded aluminum oxide. Pl.'s SOF ¶¶ 53–60, citing Pope Report at 4–6.

Defendant argues that these findings do not indicate that the Component was "defective in manufacture []or defective in design." Def.'s SOF ¶ 42, citing James Report at 26. Instead, defendant's theory is that plaintiff's "compromised biomechanics and improper use of the device, explain why his Component . . . fractured." Def.'s Reply at 3; *see also* Def.'s Mem. at 18–22 (identifying plaintiff's "Activity levels/Biomechanical Issues," Medical History," "Ignoring Doctors' Advice," "Not Following Up with Doctors," "Substance Use," and "Other Prosthesis Failures" as "other possibilities" explaining the fracture); Kneisl Report at 12 (opining that "patient specific factors, including [plaintiff's] excessive activity level, were a substantial contributing factor to the Component's fracture in 2016"). Defendant also argues that "[e]ven taking Dr. Pope's opinions at face value, they do not establish either a specific or general manufacturing defect." Def.'s Mem. at 22; *see also* Def.'s Reply at 3 (Plaintiff's "expert did not negate alternative explanations for the Component's failure.").

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

**ANALYSIS**

In order to succeed on his strict liability claim, plaintiff

> must prove by a preponderance of the evidence that: (1) the seller was engaged in the business of selling the product that caused the harm; (2) the product was sold in a defective condition unreasonably dangerous to the consumer or user; (3) the product was one which the seller expected to and did reach the plaintiff consumer or user without any substantial change from

the condition in which it was sold; and (4) the defect was a direct and proximate cause of the plaintiff's injuries.

*Warner Fruehauf Trailer Co., Inc. v. Boston*, 654 A.2d 1272, 1274 (D.C. 1995) (citations omitted). Defendant is clear: "[t]he dispute here centers on the second element, which requires a plaintiff alleging a manufacturing defect 'to prove either a specific defect . . . or a general or unspecified defect' as a result of the manufacturing process." Def.'s Mem. at 11, quoting *Corcoran v. Gen. Motors Corp.*, 81 F. Supp. 2d 55, 65 (D.D.C. 2000). And plaintiff is equally clear: "Mr. Snedgen has identified specifically how the Component was defective and specifically how Howmedica made it defective. He is not relying upon a general-defect theory." Pl.'s Opp. at 20. So the summary judgment motion turns on whether defendant has demonstrated the absence of a genuine dispute of material fact on that issue, or whether plaintiff has pointed to facts in the record that would make the issue of whether the Component had a specific defect when it left the manufacturer a genuine question for the jury to resolve.[6]

Before the Court rules on that question, though, it must address the parties' difference of opinion on the legal framework that should guide the assessment of the facts – in particular, whether it is the Second or the Third Restatement of Torts that governs how to prove a specific manufacturing defect. Defendant argues that the Third Restatement applies, and as a result, "a plaintiff must show that the product departed from its 'intended design.'" Def.'s Mem. at 12, citing *Pinkett v. Dr. Leonard's Healthcare Corp.*, No. 18-cv-1656, 2020 WL 1536305, at *4 (D.D.C. Mar. 31, 2020). Plaintiff insists that the Second Restatement applies, and that the fact finder's focus must be on whether the product was sold in a condition that was unreasonably

---

6   Defendant does not deny that a defect, had it been been present, would have been unreasonably dangerous; its motion is predicated on the grounds that "the fatigue fracture was [not] the result of . . . a . . . manufacturing defect." Def.'s Mem. at 12.

11

dangerous to the consumer or user, not whether the particular product at issue departed from its intended design. Pl.'s Opp. at 14.

While *Pinkett* did cite the Third Restatement when assessing a strict liability claim, it did not provide an explanation for why that was appropriate or rely upon authority from the D.C. Court of Appeals or this circuit; instead it quoted the holding of a federal district court that was applying New York law. *See Pinkett*, 2020 WL 1536305, at *4, citing *Bertini v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 246, 257 (E.D.N.Y. 2014). Moreover, the problem in that case was that the expert had offered no opinion identifying problems with the manufacturing process itself. *See id.* at *5.

Defendant cites additional authority favoring the Third Restatement in its reply brief, but none of those cases resolve the issue; while defendant introduces its string cite with a reference to "courts applying D.C. law," Def.'s Reply at 9–10, only one case is actually from the D.C. Court of Appeals, which is the final arbiter of D.C. law. *See M. A. P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("As this court on February 1, 1971 became the highest court of the District of Columbia, no longer subject to review by the United States Court of Appeals, we are not bound by the decisions of the United States Court of Appeals rendered after that date.").[7] And while defendant states that the single D.C. case it has identified "cit[ed] [the] Third Restatement in [the] design defect context," Def.'s Reply at 10, that is an oversimplification; the footnotes in question were not about whether a product must depart from its intended design in order to prove a specific

---

7   Defendant's D.C. Circuit cases, such as *Mills v. Giant of Maryland, LLC*, 508 F.3d 11, 14 (D.C. Cir. 2007) and *Rogers v. Ingersoll-Rand Co.*, 144 F.3d 841, 844 (D.C. Cir. 1998), cite the Third Restatement at times. Def.'s Reply at 10. But they do so in the context of the duties companies have to warn consumers about particular dangers, and this is not a failure-to-warn case. Given that *Joy* directly discusses manufacturing defect strict liability, stray citations to the Third Restatement in other D.C. Circuit cases about related but distinct causes of action do not establish a new, post-*Joy* standard.

manufacturing defect, but rather how to consider whether "a safer, alternative design" was available to the manufacturer. *See Wilson Sporting Goods Co. v. Hickox*, 59 A.3d 1267, 1276 n.6, n.7 (D.C. 2013). Moreover, *Wilson* did not adopt the Third Restatement in either footnote; instead, it noted the differing approaches that various states took, and then cited the Third Restatement with the signal "*cf. generally*," which can hardly be interpreted as a full-throated endorsement that the Third Restatement should not only control the issues in that case, but all manufacturing defect issues. *Id.*

Meanwhile, plaintiff has pointed to much more explicit sources: (1) D.C. strict liability cases applying the Second Restatement, *e.g.*, *Payne v. Soft Sheen Products*, 486 A.2d 712, 720 & n. 6 (D.C. 1985);[8] (2) a decision from the D.C. Circuit that states that "[t]he D.C. Court of Appeals has adopted the principles of strict products liability set forth in section 402A of the Restatement (Second) of Torts," *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 553–54 (D.C. Cir. 1993), citing *Payne,* 486 A.2d at 720 & n. 6, *Berman v. Watergate West, Inc.,* 391 A.2d 1351, 1356–57 (D.C. 1978), and *Cottom v. McGuire Funeral Serv., Inc.,* 262 A.2d 807, 808 (1970); and (3) a 2021 model jury instruction based on *Joy* that reads:

> The law imposes liability upon a manufacturer or seller of a product that causes injury to another or another's property due to a defect in the product which makes the product unreasonably dangerous. It is not necessary for the plaintiff to show that the defendant acted unreasonably or negligently. Rather, the focus is upon the product itself. A product is unreasonably

---

8   Defendant argues that the plaintiff in *Payne* did not include an alleged manufacturing defect, and so the case is inapposite, Def.'s Reply at 10 n.5, but footnote six in *Payne* is about the very portion of the Second Restatement at issue here. *See* 486 A.2d 712, 720 n.6 ("That section is as follows: § 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer. (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.").

> dangerous when it is dangerous to an extent beyond that which would be contemplated by the ordinary buyer who purchases the product. Thus, if you find that the product had a defect which made the product unreasonably dangerous and that the defect proximately caused injury to the plaintiff, then your verdict should be for the plaintiff.

D.C. Std. Civ. Jury Instr. No. 23-7, Ex. 2 to Pl.'s Opp. [Dkt. # 38-1]. The strict liability instruction is explained in the comments: "[t]his instruction states the classical test for product liability as set forth in section 402A of the Restatement (Second) of Torts. The D.C. Circuit Court of Appeals has quoted and approved the instruction verbatim." D.C. Std. Civ. Jury Instr. No. 23-7, Ex. 2 to Pl.'s Opp., citing *Joy*, 999 F.2d at 556–57.[9]

This is the appropriate test to apply in this case. While the D.C. Court of Appeals may choose to embrace the Third Restatement in the future, this Court is bound by that court's previous adoption of the Second Restatement in *Payne*, as well as the D.C. Circuit's recognition of that precedent in *Joy*.

That brings us to whether plaintiff has presented evidence sufficient to create a genuine dispute of material fact as to whether "the product was sold in a defective condition unreasonably dangerous to the consumer or user." *Warner*, 654 A.2d at 1274. On this point, plaintiff relies upon the findings of his expert, Dr. Pope. Dr. Pope's "examination revealed small cracks and alumina embedded in the surface of the Component, including at the laser-marking site, where the fatigue crack initiated." Pl.'s Opp. at 12, citing Pl.'s SOF ¶¶ 36, 55–56. Plaintiff's theory is that Howmedica received the Component from Systems Medical after it had been tested for the presence of defects, *see* Def.'s SOF ¶ 10 ("The manufacturing records for this particular

---

9   The jury instruction also cites *Payne*, 486 A.2d at 720 & n.6; *Stewart v. Ford Motor Co.*, 553 F.2d 130, 179 U.S. App. D.C. 396 (1977); *Fisher v. Sibley Memorial Hosp.*, 403 A.2d 1130 (D.C. 1979); *Berman*, 391 A.2d at 1356–1357; and *Cottom*, 262 A.2d at 808.

Component . . . indicate that the lot passed all tests and inspections, including a dye penetrant inspection—meaning there were no flaws, cracks, or imperfections on the Component's surface"), meaning that the introduction of these small cracks was the result of the sand blasting and dry blasting processes that took place during the defendant's internal manufacturing processes. Pl.'s Opp. at 18–19. Moreover, plaintiff's expert opines that the embedded alumina and the traits of the fatigue crack support this theory. *See* Pl.'s Opp. at 12; Pope Report at 6. After all, "[t]he media used to sandblast the Component was ninety percent aluminum oxide." Pl.'s SOF ¶ 64, citing Stypa Tr. at 17:9–17, and the dry blasting used a blasting media that "was about 3.1 percent aluminum oxide." Pl.'s SOF ¶ 67, citing Stypa Tr. at 19:4–9. A reasonable jury could conclude, consistent with Dr. Pope's expert testimony, that the product was unreasonably dangerous because the blasting techniques and related imperfections led to the fatigue crack.

While defendant adamantly disagrees with Dr. Pope's analysis, that simply underscores the fact that the matter is entirely unsuitable for resolution with a summary judgment motion. Moreover, defendant relies at points on its good faith and its record of "excellent clinical performance." Def.'s Reply at 7, quoting James Report at 24. The thrust of the defendant's motion is that the facts would not support a finding of liability under the test in the Third Restatement: "[w]hatever the effects of those processes on Plaintiff's Component . . . they are the natural consequences of the Component's intended design." *Id.* It emphasizes that "[t]he manufacturing records show that all was standard and went according to plan." Def.'s Mem. at 3; *see also* Def.'s Reply at 7, 9 ("[u]se of laser marking and grit blasting processes are ubiquitous in the design and manufacture of orthopedic medical devices and serve important purposes," and the "intent in designing the MRH tibial bearing component was to develop a product with the strength required to meet the daily activities intended of the device.") (internal quotation marks omitted).

Here the parties are simply talking past one another, and defendant's core contention is beside the point. Plaintiff's theory is that the steps taken in manufacturing the Component left it in an unreasonably dangerous condition when it was presented to him, not that it was a rogue component that resulted from a deviation from the manufacturer's standard process. As plaintiff puts it, defendant's arguments might carry the day "in a negligence jurisdiction, but D.C. has strict liability." Pl.'s Opp. at 19 n.4. Good intentions do not resolve the question of whether the product was unreasonably dangerous when it left the factory, or whether the laser marking, sand blasting, and dry blasting processes caused the fatigue crack that both parties agree caused the Component to fail. *See* D.C. Std. Civil Jury Inst. 23-7 ("It is not necessary for the plaintiff to show that the defendant acted unreasonably or negligently. Rather, the focus is upon the product itself. A product is unreasonably dangerous when it is dangerous to an extent beyond that which would be contemplated by the ordinary buyer who purchases the product.").[10] On that point, there is a genuine dispute of material fact.[11]

---

10   Even if this Court were bound to look to the Third Restatement for the elements of a strict liability claim, the case would remain a battle of the experts that is for a jury to resolve.

11   Also beside the point is defendant's emphasis on plaintiff's job, outdoorsy hobbies, and other recreational choices. Defendant may attempt to convince a jury that the Component fractured because of plaintiff's admittedly active lifestyle, rather than how the Component was manufactured. *See* Def.'s Mem. at 18 ("The record is replete with evidence as to plausible alternative causes of Plaintiff's fracture—reasons that are specific to Plaintiff's use of the Component.") (emphasis omitted); *see also* Kneisl Report at 12 ("To a reasonable degree of medical certainty, Mr. Snedgen's patient specific factors, including his excessive activity level, were a substantial contributing factor to the Component's fracture in 2016"). But this is a summary judgment motion, and defendant cannot simply present its own theory; it must show that it is entitled to judgment as a matter of law based on *undisputed* material facts.

## CONCLUSION

Defendant's motion is **DENIED**.

A separate order will issue.

*[signature: Amy B Jackson]*

AMY BERMAN JACKSON
United States District Judge

DATE: September 15, 2022